In the Matter of **PENN CENTRAL TRANSPORTATION COMPANY, Debtor.**

In re **HARLEM–HUDSON COMMUTER SERVICE; Proposed Agreements with Metropolitan Transportation Authority.**

No. 70-347.

United States District Court, E. D. Pennsylvania.

Nov. 18, 1971.

Blank, Rome, Klaus & Comisky by Marvin Comisky, Philadelphia, Pa., and Robert D. Brooks, New York City, and Robert P. Lipkin, Philadelphia, Pa., for the trustees, Penn Central Transportation Co.

Drinker, Biddle & Reath by Rush T. Haines, II, Philadelphia, Pa., for Chase Manhattan Bank.

Jack B. Justice, Philadelphia, Pa., for Girard Trust Bank.

Morris Brooke, Philadelphia, Pa., and Jones, Day, Cockley & Reavis by Herbert J. Hansell, Cleveland, Ohio, for National Railroad Passenger Corp.

George A. Burnstein, Philadelphia, Pa., for United Transportation Union.

Fox, Rothschild, O'Brien & Frankel by Nochem S. Winnet, Philadelphia, Pa., for First National City Bank of New York.

Dechert, Price & Rhoads by Matthew J. Broderick, Philadelphia, Pa., for Penn Central Co.

Ballard, Spahr, Andrews & Ingersoll by Morris Cheston, Jr., Philadelphia, Pa., for Girard Trust Bank and Morgan Guaranty Trust Co. of New York, as indenture trustees.

Davis, Polk & Wardwell by Stephen H. Case, New York City, for Morgan Guaranty Trust Co. of New York and Manufacturers Hanover Bank, as indenture trustees.

Tate & Ervin by W. Bourne Ruthrauff, and Spencer Ervin, Jr., Philadelphia, Pa., for Richard Joyce Smith, trustee, New York, New Haven & Hartford Railroad.

## MEMORANDUM AND ORDER NO. 501

FULLAM, District Judge.

The Trustees have petitioned for approval of a group of proposed agreements between the Trustees, the Metropolitan Transportation Authority and, as to one agreement, National Rail Passenger Service Corporation ("Amtrak") relating to suburban passenger train service on the Harlem-Hudson lines of the Debtor.

By way of background, it may be noted that the Trustees are the owners in fee of the rail property constituting the Hudson Division of the railroad, extending generally from Mott Haven to Albany in the State of New York. The proposed agreements relate essentially to the main tracks of this Division, between Mott Haven and Poughkeepsie. The New York and Harlem Railroad Company is the owner in fee of the rail property constituting the Harlem Divi-

sion of the railroad, but, in 1873, leased the entire property for a term of 401 years to the Debtor's predecessors; under the lease, the Trustees have, for all purposes presently material, the right of fee owners. The Harlem Division extends generally from Grand Central Terminal to Chatham, New York. The proposed agreements involve essentially the main tracks between Grand Central Terminal and Dover Plains, New York.

Approval is sought for proposed agreements in three categories: (1) a lease of the property to MTA, and sale to MTA and lease-back of certain railroad cars; (2) a service contract, for the operation of the passenger service by the Debtor; and (3) a "tripartite" agreement between MTA, the Trustees, and Amtrak for the purpose of ironing out possible areas of conflict between the other proposed agreements and the antecedent agreement between the Debtor and Amtrak relating to inter-city passenger service.

## I. THE PROPOSED AGREEMENTS

1. *The MTA Lease.* It is proposed that the Debtor lease to MTA the specified rail lines, stations, etc. for a term of 60 years, with successive options granted to MTA to renew the lease for as many as six additional five-year periods. For certain designated stations and facilities, MTA would pay rental ranging from $977,390 the first year, downward to $173,408 for the year 2022 and all succeeding years during the initial term. For the balance of the demised premises, MTA would pay only nominal rental of $1 annually. After the original 60-year term, MTA would be required to pay, during any renewal periods, the fair rental value of the property north of the Harlem River lift bridge, based upon the use to which the property is then being applied, and the fair rental value of the bare land south of the bridge.

The Trustees would reserve trackage rights, permitting them to operate freight service at present levels without additional charge. MTA would indemnify the Debtor against all taxes and *ad valorem* levies on the leased premises.

The Trustees would sell to MTA certain designated railroad cars for the cash sum of approximately 3.7 million dollars, and MTA would then lease these cars back to the Trustees, at a nominal rental, for use in providing service on the property pursuant to the service agreement hereinafter discussed.

It is contemplated (although not actually required by any of the agreements) that MTA would invest substantial sums in improving and upgrading the leased facilities (upwards of $44,000,000). With respect to these improvements, the lease provides, in paragraph 6:

> "6. Title to any improvements made to the leased premises by Lessee shall be in Lessor upon completion thereof, unless the same consists of a fixture which may be removed without causing permanent damage to the realty, in which event Lessee shall have title to such fixture and may remove the same . . . [at expiration or termination of lease]."

This language is apparently intended to incorporate decisional law in the State of New York on the subject of removable fixtures, under which a tenant who makes improvements retains title thereto and may remove them unless the real estate would be permanently damaged by such removal. *See generally:* 23 N.Y. Juris. Fixtures ¶¶23 et seq; Davis v. Bliss, 187 N.Y. 77, 79 N.E. 851, 1907; Mine Realty Corporation v. 2131 Broadway Corporation, 253 App.Div. 299, 1 N.Y.S.2d 979 (1938).

It is the stated position of MTA that the quoted clause would give the railroad title to high-level platforms and similar "building improvements," but that MTA would retain title to, and could remove, such items as transformer rectifier units, wiring, rail, switches, etc. The railroad's witness, Mr. Adams, was of the view that the railroad would acquire title to all facilities necessary for the operation of rail service. How-

ever, his interpretation of paragraph 6 of the lease, quoted above, may have been based upon the fact that, elsewhere in the proposed agreements, it is made clear that, in the event of termination of the lease, so long as the Debtor is required to provide rail service, MTA would be required to make the necessary facilities and equipment available at nominal rental.

The distinction between the vesting of title in the railroad, and the right to use the improvements even after termination of the lease, is of considerable importance in passing upon the objections filed by certain indenture trustees, who assert that the proposed lease would improperly diminish the security value of their mortgages. These and other matters will be discussed below.

2. *The Service Agreement.* It is contemplated that the Trustees would operate the suburban passenger service on the demised property, for an initial term of five years, MTA having the right to renew for as many as 17 additional consecutive five-year terms. In essence, the agreement provides that the Debtor would keep records of its costs and revenues from the service involved, would furnish monthly statements to MTA, and MTA would thereupon pay to the Debtor the amount by which expenses exceeded revenues. In the (unlikely) event that operations prove profitable, all profits would be paid to MTA. The Debtor would be paid an annual fee "for its contributed expertise" of $125,000.

The proposed agreement provides, in Section 407:

"No Penn Central Capital charge such as depreciation, interest or return on investment shall be included as Harlem-Hudson costs hereunder."

The agreement further provides, in Section 412:

"Each year during the initial five-year term hereof, Penn Central shall credit Harlem-Hudson revenues with $2,500,000, such credit to be in equal quarterly amounts at the end of each calendar quarter."

## II. DISCUSSION

■ The Debtor has been incurring substantial losses in providing the suburban passenger service on the Harlem and Hudson Divisions, averaging nearly $8,000,000 annually. The Trustees are to be commended for their untiring efforts in attempting to work out a solution to this problem. MTA, as a public agency spending public monies, has a clear responsibility to attempt to obtain as much value as possible for each dollar spent. Moreover, MTA must operate within the limits of the funds available. It may well be that the agreements now under consideration would, as a matter of business judgment, represent an adequate solution to the problems faced by the parties to the agreements, if the Debtor's bankruptcy and the rights of its creditors were not involved. Nevertheless, by their express terms, the lease and service agreements have the combined effect of (a) leasing substantial rail property for 60 or more years at nominal rental, with no return on investment as to most of the property, and (b) obligating the Debtor to provide rail service for at least five years and perhaps as many as 90 years on a basis which would make certain that there could be no reimbursement for debt service, no return on investment, no depreciation of rails, ties and switches, and no possibility of profit. For this privilege, the Debtor would be required to pay $10,000,000 over a five-year period. And if, by any chance, shouldering these continuing losses produced any tax advantage to the Debtor, the Debtor would be required to share this benefit with MTA.

■ It is, of course, essential that losses on passenger service be eliminated. No one has seriously suggested any method by which the public interest in continued commuter service can be served without considerable public support. It is apparent that the Trustees fully recognize the public interest, and

that the Debtor stands ready to supply the service to the extent of its ability. And it may well be that, for some reasonably limited period, the Trustees should be permitted to obligate the estate to bear portions of the continuing losses, as a reasonable price to pay in order to bring about the total elimination of losses. But I do not believe it constitutionally permissible to authorize committing the bankrupt estate by contract to sustain these losses permanently, or for as long as 90 years.

A further factor must be mentioned. Under the provisions of the various mortgages on the property, the mortgagees are entitled to have liens on the facilities of an operable railroad. If fixtures essential to rail operations are removed, they must, under the mortgages, be replaced by equivalent or better fixtures, which become subject to the liens of the mortgages. Under the proposed lease, it is entirely possible that the mortgagees could end up with liens on mere strips of land, which could be rendered operable in rail service only by the expenditure of substantial sums of money. It is no answer to say, as counsel for the Trustees has argued, that the lien continues on the railroad's right to use the facilities, even though title to the facilities may remain in MTA. The difficulty here is that the railroad's right to use the improvements continues only so long as the railroad is required to provide rail service. Thus, the right to use the facilities could be lost if, for example, MTA should exercise its right to substitute a different carrier to provide the service, or in the event of abandonment.

For all of the foregoing reasons, I am unable, on the present record, to approve the proposed agreements. It should be emphasized, however, that this is not necessarily fatal to the general concept involved. The Trustees may be able to produce evidence which would satisfy the Court that the lease rentals do in fact provide a reasonable return on investment. The parties may be able to convince the indenture trustees, or the Court, that the security of the mortgages would be amply protected by the improvements which are undeniably not removable fixtures. The parties may be able to defer the question of reimbursement for capital expenses, with perhaps some mutual accounting later on, which might off-set these costs against the value of improvements.

All that is now decided is that the agreements presently proposed cannot be approved, but this rejection is without prejudice to further applications.

I recognize that, by Order No. 63, this Court approved arrangements with MTA and the Connecticut Transportation Authority covering the New Haven-West End passenger service (hereinafter "MTA/CTA"), which arrangements are in many respects quite similar to the arrangements proposed here; and that, by Order No. 75, the Trustees were authorized to execute a letter of intent in connection with the present transaction, on the assumption that the final terms of the present transaction would be substantially similar to those in the MTA/CTA situation. (Tr, pp. 503–11.)

There are, however, important distinctions between the terms presently proposed, and both the MTA/CTA agreements and the letter of intent. In MTA/CTA, there was an outright purchase of a substantial part of the facilities to be operated under the service contract; the trackage rights retained by the Debtor probably were of much greater significance; and the provisions regarding reimbursable costs are dissimilar. The terms now proposed differ from the letter of intent in several important respects, not the least of which is the proposed $10,000,000 credit over the initial five-year term of the service contract. (See: affidavit of E. R. Adams, Document No. 2014, pp. 2–6.)

Thus, on their merits, it is entirely possible to justify both approval of the MTA/CTA agreement and rejection of the MTA agreements presently proposed. But the crucial distinction, it must be candidly acknowledged, lies in

**840**

the fact that no opposition was expressed to either the MTA/CTA agreements, or the letter of intent. A court's willingness to approve, as an exercise of sound business judgment, agreements as to which no question of legality or constitutionality is raised, does not establish a precedent for deciding legal and constitutional questions when they are raised. It is clear that the final documentation was not previously approved by this Court, nor did any of the parties waive their rights to object.